UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROBERT NILSEN<br>    *Plaintiff*,<br><br>v.<br><br>SJV INTERNATIONAL GROUP INC. d/b/a<br>GO LEGAL DIGITAL AGENCY and<br>STEVEN VASQUEZ in his individual<br>and his official capacity,<br>    *Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    CASE NO. 3:23-CV-392 (KAD)<br><br><br><br><br>OCTOBER 20, 2025 |

## MEMORANDUM OF DECISION
## RE: AWARD OF DAMAGES

Kari A. Dooley, United States District Judge:

This breach of contract action, commenced by Plaintiff Robert Nilsen, arises from a soured business relationship between Plaintiff and Defendants SJV International Group, Inc. d/b/a Go Legal Digital Agency (hereinafter, "SJV") and its principal Steven Vasquez ("Vasquez"). Previously, the Court entered a default judgment against SJV and summary judgment as to liability only against Vasquez. Now pending before the Court is the issue of damages. The Court held a damages hearing on May 20, 2025. Thereafter, Plaintiff and Defendant Vasquez each submitted supporting memoranda. *See* Pl. Damages Mem., ECF No. 73; Vasquez Opp., ECF No. 75. For the reasons set forth herein, the Court awards Plaintiff $4,800.00 in compensatory damages, as well as $581.94 in pre-judgment interest.

**Facts and Procedural History**

The Court assumes the parties' familiarity with the facts and circumstances underlying this civil action.

Plaintiff owned and operated an advertising and marketing e-commerce business called All Media Agency ("AMA"). Defendant Vasquez owned and operated SJV, an advertising and

marketing business "focus[ing] on lead generation for law firms throughout the United States." Am. Compl., ECF No. 32, at ¶ 7. At some time prior to 2021, Plaintiff and Defendants entered into a series of apparently oral agreements (collectively, the "Lead Generation Agreement") to "work together in providing the same advertising, marketing, and lead generation for law firms." *Id.* at ¶ 8. Pursuant to the Lead Generation Agreement, Plaintiff would enter into agreements with law firm clients (the "Client Agreements"), collect fees from those clients (the "Client Funds"), then "pay Defendants as subcontractors for services that Defendants agreed to perform per the [Lead Generation Agreement] in order to fulfill the Client Agreements." *Id.* at ¶ 9. The Client Funds were held by Defendants until the corresponding lead campaign was launched, and were used to pay "digital specialists" employed by Defendants to generate leads for the law firm clients. *Id.* The Client Funds advanced by Plaintiff were entrusted to Defendants for the specific purpose of performing the Client Agreements, and Defendants were not to use the Client Funds for any other purpose. *Id*.

    Between October 2021 and August 2022, Plaintiff transferred funds to Defendants' bank accounts "to be used to pay for the lead campaigns for various law firm clients," as well as "for future lead campaigns for individual law firms under contract." *Id.* at ¶¶ 12–13. Defendants failed to perform as required by the Lead Generation Agreement. *Id.* at ¶ 14. Plaintiff learned of Defendants' failure to perform in May 2022, and thereafter demanded return of the Client Funds. *See id.* at ¶ 10. Additionally, various law firm clients "charged back" the Client Funds initially disbursed to Plaintiff in connection with the Client Agreements. *Id.* at ¶¶ 15–19. Plaintiff later reached a confidential settlement with one of the law firm clients, in which he paid $7,300.00 "of his own personal funds." *Id.* at ¶ 21. Defendant Vasquez never provided Plaintiff "with an explanation or a full accounting of the monies in [Defendants'] possession that belongs to the

law firm clients," and on each of the foregoing occasions, refused to return the outstanding Client Funds to Plaintiff. *Id.* at ¶¶ 11, 17. Instead, Defendant Vasquez used the Client Funds for his own purposes, and for his own personal gain. *Id.* at ¶ 10.

On March 29, 2023, Plaintiff, then proceeding *pro se*, filed the Complaint. *See* ECF No. 1. On October 5, 2023, after retaining counsel, Plaintiff filed an Amended Complaint. ECF No. 32. On April 30, 2024, Defendant Vasquez filed his Answer to the Amended Complaint. ECF No. 50. On May 9, 2024, after obtaining an entry of default, *see* ECF No. 49, Plaintiff filed a Motion for Default Judgment as to Defendant SJV. ECF No. 55. On July 30, 2024, Plaintiff filed a Motion for Summary Judgment as to Defendant Vasquez. ECF No. 56. On December 5, 2024, the Court granted in part and denied in part both the Motion for Summary Judgment, as well as the Motion for Default Judgment. ECF No. 63. Specifically, the Court concluded that Plaintiff was entitled to judgment as to liability only on his breach of contract claims against Defendants Vasquez and SJV. *See id.* Thereafter, by agreement of the parties, the Court determined that it should consider and determine the sole remaining issue of damages in this case. *See* ECF No. 65. Accordingly, a damages hearing was held on May 20, 2025, wherein the parties provided testimony and additional documentary evidence regarding Plaintiff's purported damages. *See* ECF No. 72. On June 3, 2025, Plaintiff filed a memorandum of law in support of his damages calculation, seeking a damages award of $316,670, as well as $94,862.16 in interest. *See* Pl. Damages Mem. at 2. On June 23, 2025, Defendant Vasquez filed a response to Plaintiff's memorandum, and requested that damages be limited to $4,800. *See* Vasquez Opp. at 2.

**Standard of Review**

"Although [a default judgment] establishes a defendant's liability, unless the amount of damages is certain, the court is required to make an independent determination of the sum to be

3

awarded." *Melo v. Milagro Grocery Corp.*, 750 F. Supp. 3d 38, 57 (E.D.N.Y. 2024) (citation omitted). Indeed, "[t]he court must conduct an inquiry to ascertain the amount of damages with reasonable certainty." *Id.* (quoting *Joe Hand Promotions, Inc. v. El Norteno Rest. Corp.*, No. 06-CV-1878, 2007 WL 2891016, at *2 (E.D.N.Y. Sept. 28, 2007). In determining damages, "[t]he outer bounds of recovery allowable are of course measured by the principle of proximate cause. The default judgment d[oes] not give plaintiff a blank check to recover from defendant any losses it had ever suffered from whatever source. It could only recover those damages arising from the acts and injuries pleaded." *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158–59 (2d Cir. 1992) (internal brackets and citation omitted). In other words, "as it relates to the ministerial calculation of damages in the context of a default judgment . . . the application of proximate cause presumes that liability has been established, and requires only that the compensation sought relate to the damages that naturally flow from the injuries pleaded." *Id.* at 159 (citation omitted). The damages sought by the plaintiff must be established "with reasonable certainty." *Transatlantic Marine Claims Agency, Inc.*, 109 F. 3d at 111. "Where, on a damages inquest, a plaintiff fails to demonstrate its damages to a reasonable certainty, the court should decline to award any damages even though liability has been established through default." *Lenard v. Design Studio*, 889 F. Supp. 2d 518, 527 (S.D.N.Y. 2012) (collecting cases).[1]

---

[1] Whether at a trial, upon a finding of summary judgment as to liability, or following a default judgment, a plaintiff's burden remains the same. *See, e.g.*, *Gorawara v. Caprio*, No. 3:19-CV-756 (MPS), 2023 WL 6121304, at *2 (D. Conn. Sept. 19, 2023), *reconsideration denied*, No. 3:19-CV-756 (MPS), 2023 WL 8183325 (D. Conn. Nov. 27, 2023), *aff'd*, No. 24-17-CV, 2025 WL 1571762 (2d Cir. June 4, 2025) (jury instructed that the "law places the burden on [plaintiff] to prove facts that will enable you to arrive at the amount of damages with reasonable certainty"); *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 322 (S.D.N.Y. 2009) (declining, on summary judgment, to award damages not demonstrated to a reasonable certainty).

4

**Discussion**

The Court is satisfied that Plaintiff is entitled to compensatory damages stemming from Defendants' breach of the Lead Generation Agreement, plus interest. However, on the present record, Plaintiff has not established that he is entitled to the $316,670 of compensatory damages he seeks in connection with his claims against Defendants Vasquez and SJV.[2] Plaintiff's claims for damages fall into four categories: (1) $185,250 (plus interest), arising out of various wire transfers of Client Funds made by Plaintiff to Defendants, which were ultimately used for Defendant Vasquez's own, non-business purposes (the "Wire Transfer Damages"); (2) $119,320 (plus interest), arising from chargebacks initiated by the law firm clients in connection with Plaintiff's failure to perform under the Client Agreements (the "Chargeback Damages"); (3) $7,300 (plus interest) in personal funds paid by Plaintiff pursuant to a confidential settlement agreement with one of the law firm clients (the "Settlement Damages"); and (4) $4,800 (plus interest), arising from "unresolved obligations."[3] The Court addresses each category in turn.

As a preliminary matter, the Court observes that in support of his claim for damages, Plaintiff has provided the Court with his own testimony, a haphazard collection of miscellaneous documentary evidence of unclear import, and a short memorandum replete with conclusory assertions that fails to explain how the evidence submitted supports his theory of damages.[4] From there, he has essentially asked the Court to navigate this labyrinth of evidence and piece together a total damages award nearing $400,000, plus interest. But it is Plaintiff's burden to

---

[2] The Court reiterates that the damage award as to each Defendant will be the same and will be joint and several obligations for both.

[3] At the damages hearing, Plaintiff testified at some length about the alleged harm to his reputation caused by Defendants' breach of the Lead Generation Agreement. But Plaintiff's post-hearing memorandum does not seek or attempt to quantify any damages associated with this alleged reputational harm. Accordingly, the record is bereft of any basis upon which to award such damages, and the Court does not do so.

[4] Plaintiff's post-hearing memorandum is less than two pages in length and merely appends a list of money transfers or chargebacks that he asserts, without any analysis, are his documented damages. As discussed herein, he is wrong.

5

demonstrate his entitlement to damages to a reasonable certainty. *See Lenard*, 889 F. Supp. 2d at 527. And by and large, he simply has not done so. Indeed, given that the Court's determination as to liability was supported almost entirely by requests for admission deemed admitted through Defendants' failure to respond, *see* ECF No. 63, the factual circumstances of this case—and thus, the all-important issue of proximate cause, *see Greyhound Exhibitgroup, Inc.*, 973 F.2d at 158–59—remain completely undeveloped. Moreover, the Court explicitly voiced its skepticism (or perhaps confusion) as to Plaintiff's purported theories regarding his claimed damages at the hearing, but Plaintiff's memorandum does little to elucidate those theories.[5] Nevertheless, the Court has examined the record evidence and where appropriate, herein awards compensatory damages.

<u>The Wire Transfer Damages</u>

First, Plaintiff has not met his burden of establishing that he is entitled to any of the purported Wire Transfer Damages. Based on the bank records, email correspondence, and relevant testimony adduced at the damages hearing, it appears that between September 2021 and August 2022, Plaintiff d/b/a AMA transferred certain Client Funds to Defendants. And the Court has already determined that Defendants breached the Lead Generation Agreement by using the Client Funds for non-business purposes and otherwise failing to generate the leads that the law firm clients had sought. Yet, Plaintiff has wholly failed to demonstrate to a reasonable certainty that the misappropriated Client Funds are <u>his</u> to collect. By his own testimony, this was not his

---

[5] For example, during the damages hearing, Plaintiff testified that he did not recall how much each law firm received in refunds and/or chargebacks. And while the documents submitted by Plaintiff shed some light on this and other material issues, there remains little-to-no conclusive evidence regarding, *inter alia*: how much of Plaintiff's own money was used to refund the law firm clients; how much (if any) of the Client Funds were actually allocated by Defendants to third-party "digital specialists"; whether all the law firm clients sought to recover the Client Funds transferred to Defendants; and whether Plaintiff had the authority under the Lead Generation Agreement to authorize refunds or chargebacks despite the terms of the Client Agreements. These unanswered questions significantly hinder the Court's assessment of whether Plaintiff has established his entitlement to damages with reasonable certainty.

money. So it is utterly unclear how the failure to return it to Plaintiff caused Plaintiff to suffer any financial loss, or that any such loss "naturally flow[ed] from the injuries pleaded."[6] *See Greyhound Exhibitgroup, Inc.*, 973 F.2d at 159 (citation omitted). Indeed, that the Client Funds passed through Plaintiff's bank accounts before ultimately being transferred to Defendants does not alone entitle Plaintiff to recovery of those funds. Moreover, the Court agrees with Defendant Vasquez that Plaintiff's efforts to recover both the Client Funds he transferred to Defendants, as well as the amount of the law firm chargebacks, discussed *infra*, constitutes a "double dip." *See* Vasquez Opp. at 2. For these reasons, Plaintiff is not entitled to the Wire Transfer Damages.

<u>The Chargeback Damages</u>

Plaintiff is not entitled to recover the Chargeback Damages. Here, Plaintiff has shown that due to Defendants' failure to perform under the Lead Generation Agreement, several of the law firms clients became frustrated with the lack of leads being generated, and charged back the money they had paid to Plaintiff pursuant to the Client Agreements. Specifically, the invoice from Plaintiff's account with Wave Financial USA, Inc., demonstrates to a reasonable certainty that: (a) the Lake Law Firm charged back $59,045 and $15,275 in funds paid to Plaintiff d/b/a AMA; (b) the Strong Law Firm charged back $19,500 in funds paid to Plaintiff d/b/a AMA; and (c) Jason Chalik Law charged back $25,500 in funds paid to Plaintiff d/b/a AMA. *See* Wave Financial Invoice, Pl. Ex. 85. Moreover, the Court accepts that a portion of the underlying Client

---

[6] Also notable, there is no allegation that the Lead Generation Agreement included a requirement that the failure of Defendants to actually generate any leads would require return of the Client Funds to Plaintiff, or Plaintiff's law firm clients. To the contrary, the Client Agreements recognized that lead generation was not guaranteed and that the law firm clients would have no recourse in the event no leads came about as a result of the engagement.

Funds had already been transferred to Defendants, and thus, these chargebacks resulted in the loss of some of Plaintiff's personal funds.[7]

Though not clear from his testimony, or his post-hearing memorandum, it appears that Plaintiff's theory that he is entitled to the Chargeback Damages rests on the premise that *he* (d/b/a AMA) became liable to the law firm clients under the Client Agreements, based on *Defendants'* failure to perform under the *Lead Generation Agreement*. But this theory is hopelessly flawed. The terms of the Client Agreements are clear: "[AMA] has no guarantee as to the results obtained from its services . . . [and the] Client's termination of this agreement does not relieve it of its obligation to pay [AMA] for the services rendered pursuant to this agreement up to the time of cessation of services." *See* AMA Invoice, Def. Ex. 501. And on August 22, 2022, Plaintiff acknowledged to Defendant Vasquez that "we are protected by contract." 8/22/22 Email, Def. Ex. 500. Thus, Defendants' failure to provide leads and otherwise perform under the Lead Generation Agreement (to which the law firm clients were not parties) does not appear to give rise to Plaintiff's liability to the law firm clients under the Client Agreements, nor therefore provide a basis upon which Chargeback Damages can be said to naturally flow from Defendants' breach of the Lead Generation Agreement. Further, the evidence reveals, and Plaintiff acknowledged, that Plaintiff acquiesced to the chargebacks, notwithstanding the express terms of the Client Agreements. Perhaps for sound reasons, Plaintiff neither contested the chargebacks, nor asserted the Client Agreements in defense of the chargebacks. But Plaintiff's decision, even if made for sound reasons, cannot now be visited upon Defendants. Indeed, it was not reasonably foreseeable, given the plain language of the Client Agreements (to which Defendants

---

[7] Based on the testimony at the damages hearing, the Court infers that under the Lead Generation Agreement, Plaintiff would keep a portion of the Client Funds and forward the remainder to Defendants. The portion kept by Plaintiff was his compensation for securing the law firm clients and entering into the Client Agreements. It is unclear what portion of the funds that were charged back were funds that Plaintiff had kept.

were not parties), that their failure to perform under the Lead Generation Agreement would result in the uncontested collective chargeback of $119,380 in Client Funds. *See Greyhound Exhibitgroup, Inc.*, 973 F.2d at 158–59. To the contrary, Plaintiff assured Defendants that the Client Agreements "protected" them against any such effort. Accordingly, Plaintiff has not demonstrated to a reasonable certainty that he is entitled to the Chargeback Damages as a result of Defendants' breach of the Lead Generation Agreement.

### The Settlement Damages

Next, the Court concludes that Plaintiff is entitled to $4,800 in Settlement Damages. Plaintiff's request for the Settlement Damages is supported solely by Request for Admission #23, which, deemed admitted, indicates that Plaintiff paid $7,300 of his own personal funds to a law firm client for a confidential settlement; and that Defendants had "promised to pay Plaintiff for this." *See* Pl. Damages Mem., Schedule A (citing Ex. 87 at ¶ 23). However, RFA #23 was deemed admitted only for purposes of establishing liability, and in resolving Plaintiff's Motion for Summary Judgment and Motion for Default Judgment, the Court specifically held that the nature and extent of Plaintiff's damages had not, at that time, been demonstrated to a reasonable certainty. *See* ECF No. 63 at 16. Moreover, the evidence later adduced at the damages hearing decidedly *refutes* any notion that Plaintiff is entitled to $7,300 in Settlement Damages from Defendants. At the hearing, Plaintiff testified: (a) that the funds associated with the confidential settlement in question amounted to a $4,800 base settlement figure, plus associated paralegal fees, for a total of $7,300; and (b) that Defendant Vasquez was to pay the $4,800 settlement

figure, and that *Plaintiff* would incur the remaining paralegal costs.[8] The email correspondence introduced at the damages hearing supports this arrangement, *see* Pl. Ex. 22, and indeed, Defendant Vasquez has expressly acknowledged that he owes Plaintiff $4,800 "for unresolved obligations." *See* Vasquez Opp. at 2. Thus, Plaintiff has not demonstrated that he is entitled to the full amount of the alleged Settlement Damages, but he has demonstrated that he is entitled to recoup a portion of the settlement he paid. The Court therefore awards $4,800 in compensatory damages arising from the parties' confidential settlement with a law firm client.

Finally, the Court does not specifically address the fourth "unresolved obligations" damages category posited by Plaintiff, insofar such "obligations" appear wholly duplicative of the damages sought and awarded as part of the Settlement Damages.

Interest

Having concluded that Plaintiff is entitled to compensatory damages, the Court must now determine the amount of pre-judgment interest, if any, that Plaintiff may collect on his $4,800 award.

"When the Court's jurisdiction is based upon diversity, an award of prejudgment interest is governed by state law." *Garnet Analytics, Inc. v. Diversified Sols., Inc.*, No. 3:12-CV-716 (WWE), 2013 WL 6511940, at *8 (D. Conn. Dec. 12, 2013) (quotations omitted). Conn. Gen Stat. § 37-3a ("Section 37-3a") applies to interest as damages and allows a trial court to award interest as compensation for the detention of money. *See Sikorsky Fin. Credit Union, Inc. v. Butts*, 315 Conn. 433, 442 (2015). It provides that pre-judgment interest may be recovered in civil actions "as damages for the detention of money after it becomes payable," up to a

---

[8] The Court observes that Plaintiff seeks the full $7,300 in Settlement Damages notwithstanding the record evidence and his own testimony, which indicate that Defendant Vasquez and Plaintiff had reached a compromise as to that settlement. Vasquez had agreed to pay Plaintiff the base settlement portion of the $7,300, and Plaintiff agreed to cover related paralegal costs. This is troubling and raises legitimate questions as to whether Plaintiff is proceeding in good faith, particularly given the general lack of evidentiary support for Plaintiff's damages, as discussed herein.

maximum of ten percent interest per year. C.G.S. § 37-3a(a). "The purpose of [Section] 37-3a is not to punish persons who have detained money owed to others in bad faith but, rather, to compensate parties that have been deprived of the use of their money." *Sikorsky*, 315 Conn. at 442 (citation and internal quotation marks omitted). The trial court has discretion to choose the rate of pre-judgment interest. *See Sears, Roebuck & Co. v. Board of Tax Review*, 241 Conn. 749, 765–66 (1997). Indeed, "[w]hether a prevailing party will receive interest as damages pursuant to § 37-3a is principally an equitable question lying within the trial court's discretion." *N. Am. Specialty Ins. Co. v. QSR Steel Corp. LLC*, No. 3:21-CV-247 (JBA), 2022 WL 4133244, at *4 (D. Conn. Sept. 12, 2022) (quoting *Sikorsky*, 315 Conn. at 442).

Here, Plaintiff seeks simple interest at 10% "at the Court's discretion pursuant to Conn. Gen Stat. § 37-3a." *See* Pl. Damages Mem. at 2. While the Court agrees that pre-judgment interest is appropriate, Plaintiff's proposed interest rate—the statutory maximum of 10% annually—is not. Interest rates have plummeted since the 1970s, when Section 37-3a was enacted. Indeed, whereas the Federal Reserve frequently set the federal funds interest rate between eight and fifteen percent in the 1970s and 1980s, it has not set that rate above ten percent since 1984. *See Federal Funds Effective Rate*, Fed. Reserve Bank of St. Louis, https://fred.stlouisfed.org/series/FEDFUNDS (last visited October 17, 2025). Thus, a lower interest rate than the statutory maximum is warranted. *See, e.g.*, *Stuart v. Stuart*, No. X08-CV-020193031, 2004 WL 1730143, at *43 (Conn. Super. Ct. June 28, 2004) (awarding a lower interest rate than requested, in light of the historic lowering of interest rates), *aff'd*, 112 Conn. App. 160 (2009), *rev'd on other grounds*, 297 Conn. 26 (2010); *see also LanceSoft, Inc. v. Cowie*, No. 3:22-CV-968 (SDV), 2024 WL 3342286, at *5 (D. Conn. Jan. 25, 2024) ("Courts typically apply some rate less than the 10% available under § 37-3a.") (collecting cases).

Here, the average monthly interest rate for the time period between October 2022 and October 2025 was 4.65%. *See Federal Funds Effective Rate*, *supra*. Thus, the Court finds that simple pre-judgment interest at an annual rate of 4% beginning on October 18, 2022 is fair and equitable under the circumstances.[9] Simple interest accruing at 4% results in a per diem accrual of $0.53. Therefore, the Court awards Plaintiff $581.94 in pre-judgment interest.

**Conclusion**

For the reasons set forth herein, the Court awards Plaintiff $4,800.00 in compensatory damages, as well as $581.94 in pre-judgment interest, for a total damages figure of $5,381.94. Post-judgment interest shall accrue pursuant to 28 U.S.C. § 1961. The Clerk of Court is directed to enter final judgment and close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 20th day of October 2025.

 */s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE

---

[9] The Court's calculation of the time period for the assessment of pre-judgment interest is based on the email correspondence in the evidentiary record indicating that, as of October 18, 2022, Defendant Vasquez was under an obligation to pay the $4,800.00 settlement figure. *See* 10/18/22 Email, Pl. Ex. 22.